# GALEHOUSE v. MINNEAPOLIS, ST. PAUL, & S. S. M. R. CO.

(— L.R.A.(N.S.) —, 135 N. W. 189.)

**Writ and process — summons and complaint — indorsement of, by sheriff — presumption of regularity.**

1. An indorsement stamped by means of a rubber stamp on the back of a summons and complaint, of the words, "In the sheriff's office, December 2, 1908, John J. Lee, Sheriff, Ward County," under § 2503 of the Codes of 1905, which makes it the duty of the sheriff to indorse "upon all notices and processes received by him for service, the year, month, day, hour, and minute of reception," and under § 7317 of the Code, which provides that "the presumption that official duty has been regularly performed is satisfactory if uncontradicted," will be deemed satisfactory evidence of the facts therein contained, and that the summons and complaint were delivered to the sheriff for service upon the day stated, in the absence of satisfactory proof to the contrary.

---

Note.—On the general question who is a passenger, see note in 61 Am. St. Rep. 77.

On the question whether an assault growing out of a quarrel commenced while an employee is acting within the scope of his employment may be regarded as a personal act of the employee, for which the employer is not liable, see note in 9 L.R.A. (N.S.) 475.

Carriers — who is a passenger.

2. A person is not a passenger, and entitled to consideration and protection as such, who, after waiting all day in a station for a train, and discovering that he will be unable to reach his destination in time for the accomplishment of the purpose of his journey, leaves the station and goes to an hotel for supper, and then returns to such station for the purpose of sending a telegram announcing the fact that he will be unable to make the journey, and that it is his intention not to attempt to do so.

Master and servant — assault by employee — scope of authority.

3. The mere fact that an employee is authorized to preserve order upon the premises of his employer does not make an assault committed by him upon a patron of his employer an act done within the scope of his authority, for which his employer will be liable, when the evidence shows that the assault made was not made for the purpose of preserving order or ejecting such person from the premises in pursuance of such authority.

Master and servant — assault by employee — scope of authority.

4. When there is a conflict in the evidence, but the testimony of the plaintiff's witnesses, if believed, would justify the jury in finding that a common carrier of telegraphic messages neglected to promptly deliver a death message to the plaintiff, so that plaintiff was unable to take a train by which he could have reached the home of the deceased in time for the funeral, and the plaintiff, after waiting all day in the station for a later train, and then finding that he would be unable to reach his destination in time, went to the telegraph office to send a message announcing the fact, and, on being informed that the wires were down and such message could not be sent, complained because of the failure of the company to deliver the message promptly in the morning, and, on account of such protest, was assaulted by the telegraph operator, the common carrier of telegraphic messages may be held responsible for such assault and liable in damages therefor.

Master and servant — assault by employee — provocation.

5. If, however, after going to the depot for the purpose of sending the message, and after being informed that such message could not be sent on account of the fact that the wires were down, the jury had found that plaintiff had not merely complained of the failure to deliver the message in the morning, but had called the employee a liar, or used other opprobrious language which incited the employee to make the assault, so that the assault was the result of the irritation occasioned by the use of such language, and not of the mere fact of the making of the complaint, the employer would not be liable in damages therefor. "One may not by his acts spoil an instrument, and then sue the manager because the performer does not make good music."

Person going to telegraph office to send message or make complaint as trespasser or licensee — right to protection.

6. A person who goes to a telegraph office to send a message or to make a

complaint as to the failure to deliver the same is not a trespasser or licensee, but a customer or patron, and is entitled to treatment and protection as such.

**Appeal — presumption as to correctness of instructions.**

7. Where the evidence is in conflict, and the record shows that the trial court instructed the jury, but omits entirely to include such instructions, it will be presumed on appeal that such instructions were correct, and properly presented the law and the issues to the jury.

Opinion filed February 17, 1912.

Appeal from the District Court of Ward county; *Burke,* J.

Action against defendant company for an assault committed by its employee upon plaintiff. Verdict and judgment for plaintiff. Defendant appeals.

Affirmed.

This is an action to recover damages for an alleged assault upon the plaintiff by one Clarence Holiday, an employee of the defendant, at its station in the city of Donnybrook. The complaint alleges that the defendant is a common carrier of passengers and freight, and of telegraph messages for hire and profit; that during the month of December, 1906, the plaintiff was in the passenger depot of the defendant company at Donnybrook as a passenger, and for the purpose of doing business in a lawful way with said defendant as a common carrier of passengers and telegrams, and that while so engaged and while attempting to send a telegram over the telegraph line operated by the defendant in connection with its line of railway, he was assaulted by the said Holiday, "who was then and there the servant, employee, and agent of the said defendant, acting within the scope of his employment, duty, and authority as such servant, employee, and agent of the defendant." The answer admits that the defendant is a railway company, but denies the other allegations of the complaint. It also alleges that if any assault was committed it was on account of the fact that the plaintiff made the first assault, and that the assault complained of was made in self-defense. It further pleads the two-year statute of limitations. The defendant and appellant maintains that the summons and complaint were not filed until December 12, 1908, and if this be the fact, the statute of limitations ran against the action. It is claimed by the plaintiff,

however, that the summons and complaint were delivered to the sheriff of Ward county for service on the 2d day of December, 1908. There is no evidence upon the point except the papers themselves. On the back of the summons and complaint there is stamped, by means of a rubber stamp, the words: "In sheriff's office, December 2, 1908, John J. Lee, Sheriff, Ward County;" and no other evidence but such indorsement was offered as to the date of the commencement of the action, plaintiff's attorney testifying merely that on his way home from his office—he did not recollect the date—he handed the summons and complaint to the deputy sheriff, and that he stamped it there with a rubber-stamp machine; that "he changed it before he put the stamp on;" that he "monkeyed with it, and put the stamp on there. How he changed it I don't know;" that he turned it either back or forward. There is some evidence, also, that this method of indorsing the date of receipt is the present custom of the office, but this evidence was objected to, and probably with reason, as it did not date back to the time of the transaction.

As far as the assault is concerned, and the reasons therefor, it is undisputed that at 2 o'clock in the morning a telegram addressed to the plaintiff was received by the defendant, announcing the death of the plaintiff's stepmother, and that the said telegram was not delivered until 9 o'clock; that the night train was late, and had the message been delivered promptly, plaintiff could have taken such train and attended the funeral; that in the afternoon he went to the depot of the defendant, intending to take the second train, but, after waiting around an hour or two, found that he could not possibly reach his destination in time, so left the depot and went to a hotel for supper, and after supper returned to the railway station for the purpose of sending messages to his relatives that he could not come; that the station agent, Hough, gave him some blanks, but told him that he could not accept the telegrams, as the wires were down. So far there is little or no conflict in the testimony, and it was after this point that the dispute occurs. According to the plaintiff's testimony, which is corroborated by the witness McCarthy, he then asked the station agent, Hough, why the message in the morning had not been delivered to him so that he could have caught the east-bound train, and that at this point one Holiday (the night operator, who was in the office and behind Hough) spoke up

and said, "I did not know where you lived, and, damn you, I would not have delivered the message if I had. I will show you about delivering messages!" and that said Holiday then rushed out of the office and assaulted the plaintiff. The witness McCarthy adds testimony to the effect that Holiday said: "We have had just about enough of you around here, coming down here trying to bull-doze the whole crowd, and I will show you;" and that he then rushed into the waiting room and made the assault, first unlocking the door of the office which intervened. The witness Holiday testified, on the other hand, that when Galehouse came into the office Holiday was probably at the instrument; that he was exchanging work until late at night; that Galehouse asked why that message had not been delivered when it was received; that Holiday probably said nothing at first, until Galehouse began to talk over the agent to him; wanted to know why he had not delivered that message; that he, Holiday, told him, Galehouse, that he did not know where he lived, and, further, that he could not get off at that time; that he believed Galehouse used some abusive language at that time; that he asked why he did not deliver the message, and he, Holiday, said, "I don't know where you live, and what about it even though I did not deliver the message?" and that Galehouse then told him to come outside and he would show him what about it; that he then rushed outside and unlocked the intervening door, and that immediately he got into the outer office Galehouse struck him and the combat began. Holiday also testified that it was his duty to keep order in the station, but from his evidence it is quite clear that in making the assault, if any, he was acting from personal motives, and not with any desire to preserve order in the building or eject the plaintiff for that purpose. It, indeed, appears to be quite evident from the testimony that he either went into the outer office because challenged so to do by the plaintiff, or because he was angry and wanted to give vent to his individual and personal spite. There is nothing in the evidence to show that the plaintiff was ordered to leave the building, or rebuked in any way by the agent, Hough, for making a disturbance, nor that the police authorities were called upon either before or during or after the fracas. There is, also, no evidence tending to show that the agent, Hough, actively tried to prevent or terminate the engagement. The parties were separated, if at all, by the witness McCarthy, who came into the build-

ing with the plaintiff. The agent, Hough, testifies that Galehouse called
Holiday a liar, and that the lie was passed back and forth; that Gale-
house invited Holiday to come out; that at that time he decided to
interfere; that Holiday was very quick and went out; that he could
not remember whether the door was open or shut, but that he reached
it before he did and went out, and that as he was passing out of the
door Galehouse struck him; that he, Hough, went back into the office
and picked up the lantern, and that he heard quite a commotion out
in the waiting room, and that he afterwards was told that Galehouse
was knocked down; "I did not see, but when I got out there they were
both on their feet and were going around, and it was pretty fast and
exceeded all my expectations;" that there was no light in the outer
room, and that it was merely lighted by the light which shone from
the window of the inner office. The testimony of Hough and Holiday
is corroborated to a greater or less degree by that of two other em-
ployees of the company.

On the trial the defendant and appellant objected to introduction
of any evidence under the complaint, on the ground that the complaint
did not state facts sufficient to constitute a cause of action, and that
the record did not show that the action was commenced within the
period limited by law. It, also, at the conclusion of its testimony,
moved the court to dismiss the action on the ground that the plaintiff
had failed to establish the agency of Holiday; the fact that the tele-
graph company was any portion of the defendant; that the action had
been brought within the statutory time; and that the assault was com-
mitted within the course of duty of the said Holiday as an employee
of the company. These motions were overruled, and a motion was
made to direct a verdict for the defendant on the same grounds. This
motion was also overruled. A verdict was rendered in favor of the
plaintiff and respondent for the sum of $300, and judgment entered
thereon. A motion for a new trial was then made and overruled, and
defendant appeals.

F. B. Lambert, for plaintiff and respondent.
Palda, Aaker, & Greene, for defendant and appellant.

Bruce, J. (after stating facts as above). The first point to be

considered is whether the statute of limitations ran against the action in question. The presumption of law is that a public officer does and will do his duty. Section 2503 of the Code of 1905 makes it the duty of the sheriff to "indorse upon all notices and process received by him for service, the year, month, day, hour, and minute of reception, and issue therefor to the person delivering it, on payment of his fees, a certificate showing the names of the parties, title of paper, and time of reception." Section 6795 of the Revised Codes provides that "an attempt to commence an action is deemed equivalent to the commencement thereof within the meaning of this chapter when the summons is delivered with the intent that it shall be actually served, to the sheriff." While § 7317 of the Code provides that the presumption that official duty has been regularly performed is satisfactory if uncontradicted. In 25 Cyc. 1424, it is stated: "It will be presumed that the indorsement on a complaint of a certificate showing the date of filing, when made by the clerk of the court, is correct," while in the case of Lewis v. Seattle, 28 Wash. 639, 69 Pac. 393, where the filing marks of the complaint showed that the action was commenced within the statutory period, but the appearance docket indicated that it had been commenced one day later, and no. evidence was introduced to show the true date, the court held that "the court will presume as against the statute of limitations where these dates disagree and no showing is made of the true date, that the certificate on the complaint shows the true date." It is presumed that an officer does his duty, and that his proceedings are regular. There seems in this case to be no evidence which even tends to disprove the contention that the summons and complaint were delivered to the sheriff for service upon the date stamped thereon, and it is clear from the authorities and from our statute that an action is commenced, so far as the statute of limitations is concerned, when the writ is filled out and delivered to the proper officer, with the bona fide intent to have it served at once, and not at the time that the actual service is made. Ewell v. Chicago & N. W. R. Co. 29 Fed. 57; Evans v. Galloway, 20 Ind. 479; Hampe v. Schaffer, 76 Iowa, 563, 41 N. W. 315; Johnson v. Farwell, 7 Me. 370, 22 Am. Dec. 203; McCracken v. Richardson, 46 N. J. L. 50; Davis v. Duffie, 18 Abb. Pr. 360; Riley v. Riley, 141 N. Y. 409, 36 N. E. 398; reversing 64 Hun, 496, 19 N. Y. Supp. 522; Goldenberg v. Murphy,

108 U. S. 162, 27 L. ed. 686, 2 Sup. Ct. Rep. 388. We do not think that the action was barred by the statute of limitations.

When we pass on to the merits of the case we find a sharp conflict in the evidence as to who was the aggressor in, and the reasons for, the physical controversy. We can find nowhere in the record the charge of the court to the jury, though the record shows that a charge was given. In its absence we must conclude that all questions were propertly submitted to the jury, and since a verdict was rendered for the plaintiff we must conclude that these questions were resolved by the jury in favor of the plaintiff. The only questions, then, for us to consider are whether the plaintiff was a passenger, and, if a passenger, whether the railway company was liable to him for the assault, or, if not a passenger, whether the company, as a telegraph company in the transaction of the business as such, was responsible for the assault of its servant, Holiday, upon him.

We are clearly of the opinion that the plaintiff in this case was not a passenger at the time of the altercation, and that his right of recovery, if any, cannot be based upon that theory. His own evidence conclusively shows that he had no intention of taking a train that night, and that he was not at the time of the altercation upon the premises of the company either for the purposes of taking a train, or after having alighted from one. A passenger has been defined to be "one not a servant of the carrier who, by the consent of the carrier, express or implied, is being transported in the vehicle of the carrier from place to place, or who is at a station of the carrier with the intention of at once, or as soon as possible, entering upon such relation." Van Zile, Bailm. & Carr. § 594. There is no question that "a person who goes into the station of the carrier with the bona fide intention of becoming a passenger is entitled to the privileges and the rights of a passenger, at least so far as the safety of his person from abuse or assault, or defects in the station platforms, etc., is concerned." Van Zile, Bailm. & Carr. § 596, and cases cited. It is also probably true that the relationship continues while the traveler is on the premises of the carrier, even after he has alighted from the vehicle, for a period of time reasonably necessary to enable him to leave the premises. Van Zile, Bailm. & Carr. § 605, and cases cited. We can find, however, no authority to support the proposition that it continues for any longer period.

But the evidence shows, and counsel for appellant admits, that the defendant was, at any rate, engaged in the business of a telegraph company, and in such capacity was dealing with the plaintiff at the time of the assault. The evidence is clear that it took and transmitted messages, and that it was for the purpose of sending messages that the plaintiff was upon the premises at the time of the alleged assault. It is also clear that it was while discussing the plaintiff's failure to deliver the message received by the company in the morning and directed to the plantiff that the controversy occurred. Plaintiff was not a trespasser, nor was he merely a licensee. He was on the premises of the company or in their telegraph office on business connected with the business of the company as a telegraph company and at its implied invitation. He was there as a customer or patron, and not as a licensee or as a trespasser. It is undisputed that the company, for some reason or other, had failed to promptly deliver to him a death message in the morning. It is also undisputed that plaintiff went to the telegraph office in the evening for the purpose of sending some other messages, and that while there and after being told that such other messages could not be sent, he asked why the message in the morning had not been delivered to him, and that it was in discussing this matter that the controversy arose. There is, it is true, a conflict in the testimony as to who was the aggressor, but there is certainly enough evidence in the record to justify the jury in finding the facts for the plaintiff; at least it is a mere question of the credibility of the witnesses. It is also undisputed that the message which was addressed to the plaintiff and received in the morning was in relation to the death of a relative; that on account of the failure to deliver it he was unable to attend the funeral, and it was not unreasonable for him to ask for an explanation in the premises. Of course, if, as the witness Holiday testifies, the plaintiff dared him to come out into the other part of the office and settle the matter, or if the plaintiff himself intentionally provoked the assault, the company should not be held liable; but these matters have been decided by the jury, and we cannot interfere with their decision.

It is, of course, well established that the doctrine of *respondeat superior* does not, as a rule, apply where the tortious acts of the servant are not done in the course of his employment, but from personal malice. To use the language of Judge Cooley, "The liability of the master for

intentional acts which constitute legal wrongs can only arise when that which is done is within the real or apparent scope of the master's business. It does not arise where the servant has stepped aside from his employment to commit a tort which the master neither directed in fact, nor could be supposed from the nature of his employment to have authorized or expected the servant to do." Cooley, Torts, 2d ed. p. 627. This general rule, however, has been generally stated in cases where the main transaction in furtherance of which the tort was committed was not within the actual or apparent scope of authority. The learned judge illustrates this point as follows: "So, if the conductor of a train of cars leaves his train to beat a personal enemy, or from mere wantonness to inflict any injury, the difference between his case and that in which the passenger is removed from the cars is obvious. The one trespass is the individual trespass of the conductor, which he has stepped aside from his employment to commit; the other is a trespass committed in the course of his employment in the execution of orders the master has given, and apparently has the sanction of the master and contemplates the furtherance of his interests." See Cooley, Torts, 2d ed. p. 628. The rule in its entirety is perhaps as well stated in the editor's note following Franklin F. Ins. Co. v. Bradford, 88 Am. St. Rep. 770, 792, as anywhere else. "Where an agent," the editor says, "steps aside from the performance of the business for which he was employed by his principal and embarks upon a matter of his own, the principal is not liable for the consequences of the agent's act while so engaged. If, while engaged in executing the employment of his principal, he so conducts himself, whether negligently or maliciously, as to injure another, his principal will be liable. If, however, he forsakes such employment, and purely, for his own benefit or to gratify some personal hate, does an act unconnected with the service of his principal, the latter is not responsible for its consequences. The agent may immediately, after the commission of the act, resume the performance of the duties of his agency, and in the commission of the tort may have employed the instrumentalities furnished by the principal for the proper performance of his duties. As to the act itself, however, the doctrine of *respondeat superior* is inapplicable, and no liability therefor can attach to the principal." The question in the case at bar is whether the agent, Holiday,

at the time of committing the tort in question, was connected or un-connected with the service of his principal.

There is absolutely nothing in the contention of the respondent that Holiday committed the assault while attempting to preserve order in the depot and while acting in the capacity of a policeman. The only evidence which in any way tends to prove this contention is the statement of Holiday that it was his duty to preserve such order; but all the facts of the case, and his own admissions, conclusively show that he went out "to fix the plaintiff or let the plaintiff fix him," and that his main purpose was to satisfy his own anger and resentment, and not to preserve order, and the interests of his employer was the last consideration which actuated him. If we sustain the judgment in the case, then, it cannot be upon the theory that the plaintiff was a passenger, or that he was illtreated while the defendant's agent was seeking to preserve order, or that the agent was really acting with the interests of his employer in mind, though overzealously, but upon a theory which is more general and universal.

It would seem from the facts that the case comes clearly within the rule laid down in Dickson v. Waldron, 135 Ind. 507, 24 L.R.A. 483, 41 Am. St. Rep. 440, 34 N. E. 506, 35 N. E. 1, where a patron of a theater was assaulted by the ticket agent in a controversy arising out of a claimed shortage in change. In this case a ticket had been sold to the plaintiff, and he afterwards went back to the ticket office, claiming that short change had been given to him. The court held that though the assault was committed in excess of the authority of the agent, it was still committed while he was acting as ticket agent, and as the result of a controversy arising out of the discharge of his duties. The assault in the case at bar was certainly committed in a controversy arising out of a transaction of the company and while the plaintiff was asking questions which he had a perfect right to ask the agent in relation to such business. In the Dickson Case, above cited, the court said that "the trouble was occasioned entirely by a dispute as to the purchase of tickets, and both the ticket seller and the doorkeeper acted within the business of their employment, maintaining that side of the controversy which was their master's interest." So, too, the Dickson Case is authority for another proposition which also seems applicable to the case at bar and sound in principle, and that is that there is a difference be-

22 N. D.—40.

tween a licensee and a patron, and that a patron is entitled to a consideration, which, perhaps, need not always be accorded to a licensee. "But common carriers, innkeepers, merchants, managers of theaters, and others who invite the public to become their patrons and guests, and thus submit personal safety and comfort to their keeping," says the court in the Dickson Case, "owe a more special duty to those who may accept such invitation. Such patrons and guests have a right to ask that they shall be protected from injury while present on such invitation, and particularly that they shall not suffer wrong from the agents and servants of those who have invited them." See also Chicago & E. R. Co. v. Flexman, 103 Ill. 546, 42 Am. Rep. 33; Craker v. Chicago & N. W. R. Co. 36 Wis. 657, 17 Am. Rep. 504.

The case of Richberger v. American Exp. Co. 73 Miss. 161, 31 L.R.A. 390, 55 Am. St. Rep. 522, 18 So. 922, is very much in point. In it plaintiff has been made to pay an overcharge by a local express agent, and took the matter up with the general superintendent, who stated that the matter would be arranged. Later he went to the local express office to transact some other business, when the local agent in charge informed him that he desired to refund the overcharge to him, and then and there returned such overcharge. He at the time, however, required the plaintiff to sign a receipt for the same, and immediately on the reception of the receipt, and while the plaintiff was in the office of the company, cursed and insulted, and otherwise maltreated him. · The Mississippi court sustained an action against the express company, and stated that the true test of liability was "not whether the tort was committed in pursuance of orders from the master, or against orders, whether the master ratified or not, whether the tort was wilful and malicious or not, but whether, and solely whether, the act constituting the tort was done in the master's business." In answer to the suggestion that the rule of strict liability as laid down in the case of Craker v. Chicago & N. W. R Co. supra, only applied to carriers of passengers on account of the fact that the passengers were more or less within their power and control, the Mississippi court said: "Doubtless there is a difference in the extent of the application of the principle as between carriers of passengers and express companies, measured exactly by the difference in the things done by them in the discharge of their duties, respectively. But the principle applies to both. An express company does not transport passengers, and

cannot be made liable as a carrier of passengers might for wilful torts committed by its agents on passengers in their transportation; but it keeps offices for the transaction of its proper business, a business calling to its offices every day thousands of citizens, and in its dealing with its customers in its offices, in its business, it is bound, in Judge Story's language, 'for respectful treatment and for decency of demeanor.' It is impossible to say on the allegations of this declaration, that the tort committed immediately upon the delivery of the receipt to the agent and because of the demand for the refunding of what was plaintiff's conceded due, was so separated in time or logical sequence as not to have been an act done in the master's business. The whole transaction occurred in the shortest time, and was one continuous and unbroken occurrence. The cursing and abusing and maltreatment were all administered in connection with the taking of the receipt, and immediately upon its delivery, and because of the demand of his rights in that matter, and while plaintiff was in appellee's office to transact and transacting this very business. What was said and done thus immediately upon the delivery of the receipt was part of the *res gestœ*. As well said by Judge Thompson in his Commentaries on Corporations, § 6299, top of page 4928: 'In this view, even under the modern doctrine, the acts or declarations of the servant or agent, tending to show his state of mind at the time of the act complained of, would be admissible in evidence as part of the *res gestœ*.'" The court then concludes by saying: "We close this opinion with the words of the same great judge [Andrews, J.] in the same case [Rounds v. Delaware; L. & W. R. Co. 64 N. Y. 134, 21 Am. Rep. 597] to show here a case of liability: 'The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion, aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another.'"

Another case that seems equally in point is that of the Georgia R. & Bkg. Co. v. Richmond, 98 Ga. 495, 25 S. E. 565. In it the plaintiff purchased a railroad ticket from the defendant. At the time of such purchase he requested the agent to check his baggage for the train next going to Augusta, upon which he intended, himself, to embark, and

which was due in a few minutes; this the agent refused, and plaintiff was compelled to miss the train. After the train had passed, and, desiring to avoid further trouble and delay, he again requested the agent to check his baggage for the next morning's train stating to the agent that he had been badly treated about his baggage and would not soon forget it, or words to that effect, when the agent, without provocation and without notice or warning, made a malicious and violent assault upon him. The court reversed a verdict for the plaintiff because of an instruction in regard to sneering remarks, etc., and for which there was no foundation in the evidence. On the main questions of the case, however, it said: "We do not think Richmond was a 'passenger' when he returned to the railroad station the last time on the day he claims to have been unlawfully assaulted and beaten by the company's agent. He had no purpose of taking a train that day, having decided to resume his journey on the following morning. However, he undoubtedly had the right to go to the station for the purpose of looking after his baggage, and arranging to have it checked or safely stored until the next day. If he went there to attend to this business and conducted himself properly, he was entitled to respectful treatment from the agent; and if the latter, under these circumstances, unlawfully assaulted and beat him, it was his right to hold the company responsible in damages. The law on this subject is too well settled to require the citation of authority. It may, in this connection, be proper to add, however, that even if Richmond went to the station for the lawful purpose of attending to the business above mentioned, it was nevertheless incumbent upon him to treat the agent with the same respect due him by the agent. Therefore, if, instead of so doing, he, without provocation, used insulting or opprobrious language to the agent, which naturally enough resulted in a difficulty, the company should not be held responsible. In other words, if Richmond, by his own improper behavior, unfitted the agent from exercising the care and prudence which were essential to the performing in a proper manner his duty to the company and to the plaintiff, the latter should not complain. The case would then stand somewhat like that of Peavy v. Georgia R. & Bkg. Co. 81 Ga. 485, 12 Am. St. Rep. 334, 8 S. E. 70, in which Judge Bleckley remarked that 'the plaintiff spoiled the instrument, and then sued the manager because the performer did not make good music. It was the plaintiff's fault that the [company's servant]

was out of tune.' If, however, the truth be that Richmond went to the station not really for the purpose of transacting any legitimate business with the agent, but simply to upbraid or reproach him because of a real or supposed grievance occurring at an earlier hour of the day, and a difficulty then arose between these men, it was one in which the company had no concern whatever, and should be treated as any other fight occurring between ordinary citizens."

It would seem, indeed, as if the true rule was contained in the cases last cited, and the test is whether while dealing with the agent and in a manner that he is authorized or invited to deal with him in, the assault occurred, or whether it was entirely outside of the transaction, although arising out of the transaction, or was provoked by him so as to degenerate into a personal difficulty rather than one between him and the employer. Sending a telegram, asking for change, or complaining because of a delayed telegram, is the transaction with the employer rather than with the agent, and unless the discussion turns into personal vituperation the employer is a person concerned. If, in the case at bar, the testimony of defendant's witnesses is to be believed, and the jury had found that the assault occurred either because the plaintiff called the witness Holiday a liar, or challenged him to come out and settle the issues with him, the company would not have been in any way liable, and the reasoning of the case of Johanson v. Pioneer Fuel Co. 72 Minn. 405, 75 N. W. 719, would have applied. The conflict, in fact, would have been a personal one, and the result of a personal dispute and personal vituperation. If, on the other hand, the testimony of the plaintiff and his witness McCarthy is the testimony which is to be credited, the action can be maintained. The jury evidently resolved the doubt in favor of the plaintiff, and we cannot well interfere with their decision.

There can be no doubt that the weight of authority is to the effect that an employer will not be liable for the torts of his servants committed entirely outside of the scope of their authority and duty, and from malicious and personal purposes. There are also numerous authorities which explain the holding of the case of Craker v. Chicago & N. W. R. Co. 36 Wis. 657, 17 Am. Rep. 504, and the cases which follow it, upon the theory that in the case of the railway company the passenger is under the exclusive control and power and at the mercy of the em-

ployees of the company. There are few authorities, however, which hold that the employer should not be held liable for an assault committed without authority upon a person while he is dealing with the employee in a matter which is in the scope of the authority of the agent. We do not, indeed, believe that the *dicta* in the case of Williams v. Pullman Palace Car Co. 40 La. Ann. 87, 8 Am. St. Rep. 512, 3 So. 631, is good law, which states that "a person has the right to enter a bank for the purpose of collecting a check and to present it to the paying teller for payment, but if, on such presentation, the teller should leap over the counter and knock him down, surely such an act would not subject the bank to liability. So one may lawfully enter a store and deal with any clerk with reference to the purchase of goods, but if, on some dispute, the clerk should commit assault and battery upon him, the merchant would not be responsible therefor; or, if one on lawful business should knock at the door of any private house and, on asking the servant who answered the call, for permission to see the master, the servant should assault and beat him, would the master be responsible? Clearly in all such cases the lawfulness of the party's conduct, and the fact that the injuries were received while he was properly dealing with the servant as servant, would not suffice to bind the master unless the latter had expressly or impliedly authorized the act, or had been guilty of some fault in knowingly employing so dangerous a servant." We, indeed, believe the statement to be only a half truth, and the question is as to whether the assault is committed while discussing, or in relation to, a matter with which the person assaulted has a right to deal with and discuss with the agent. There can be no question that, if the occasion of the assault is something entirely extraneous to the subject of the visit or the interview, and extraneous to the subject-matter concerning which the agent has express or implied authority, that the master will not be liable, but to go any further is hardly warranted by the decisions or by sound public policy. If the assault arises out of a purely personal matter, the employer should not be liable, but if it arises out of a dispute in regard to the business of the principal, which the third party is justified in transacting with the agent, the matter is entirely different. Daniel v. Petersburg R. Co. 117 N. C. 592, 4 L.R.A.(N.S.) 485, 23 S. E. 327. Plaintiff in this case had a right to send his message and reasonably to inquire why the message in the morning had not been de-

livered. The mere fact that he made the inquiry and the complaint before is not controlling. In the evening he found that not only could he not take his train, but that he could not send his message on account of the wires being down. It was but reasonable and natural for him to complain of the supposed neglect in the morning, if for no other purpose than to induce the employees of the telegraph company to use every means to aid him in the present juncture. We are not sure, it is true, that his complaint was reasonable in form. There is a sharp conflict of the evidence on this proposition, but as to this matter we believe that the verdict of the jury is conclusive, and we must assume, in the absence of any instructions in the record, that the instructions properly covered the questions in controversy. To say that one cannot make a complaint at a telegraph office but at the risk of a personal assault, for which the assailant alone will be liable, and that, when hearing such complaint, the agent is not acting for his employer, is to extend the rule of the cases altogether too far.

The judgment of the District Court is affirmed.

BURKE, J., having presided on the trial in the court below, did not participate.